IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2008 Session

**JEANNE W. FICKLE v. JAMES EDWARD FICKLE**

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002203-05     Robert L. Childers, Judge**

**No. W2007-01509-COA-R3-CV - Filed August 19, 2008**

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and WALTER C. KURTZ, SR. J., joined.

Stevan L. Black and Vickie Hardy Jones, Memphis, Tennessee, for the appellant, James Edward Fickle.

Mitchell D. Moskovitz and Mary Morgan Whitfield, Memphis, Tennessee for the appellee, Jeanne W. Fickle.

**OPINION**

In this divorce action, Husband appeals the trial court's valuation of his closely held stock and the classification of its appreciation as marital property; the $75,000 award of alimony *in solido* to Wife to account for her interest in the appreciation of that stock; the award of $1,500 per month in transitional alimony for 60 months; and the award to Wife of $25,000 in attorney's fees incurred through trial and of $1,500 in attorney's fees incurred in defending against husband's motion to alter or amend the judgment. We affirm.

James Edward Fickle (Husband) and Jeanne W. Fickle (Wife) had been married approximately thirteen years when Wife filed the complaint for divorce, alleging inappropriate marital conduct and irreconcilable differences, on April 21, 2005. On August 9, 2005, the trial court entered a consent order between the parties to halve the equity in the marital residence. Husband re-financed the mortgage, remained in the home, and paid Wife $120,843.13 for her half. Wife applied a portion of that amount toward a down payment on a home for herself. Husband answered the complaint and the trial took place from February 19, 2007, to February 21, 2007.

At the time of trial, Husband was 67 years old, and Wife was 61 years old. No children were born of the marriage. Wife was employed as a senior project manager at First Tennessee with a projected 2007 income of $72,914.[1] Husband, a professor at the University of Memphis, taught during the usual school term, during summer school, and through an online course, and earned at least $101,000 in 2006.[2] Husband earns an additional $20,000 per year through a consulting agreement with Yale University. He is also under contract to write numerous books from which he will earn additional income, but he has already received approximately $125,000 in advances from two organizations, the United States Forest Service and the Alabama Forestry Association. At the time of trial, Husband had begun work on both publications but testified they were less than halfway complete. Upon completion of the publications, Husband will receive another $75,000 in total from both organizations. Similarly, he receives approximately $2,072 per month in Social Security income. Finally, Husband receives farm income each year from two Indiana properties owned by DMF Properties, Inc., a corporation he wholly owns.

The trial judge granted the divorce to Wife upon the stipulated ground of inappropriate marital conduct, rendered a bench ruling on February 28, 2007, and entered the final decree on the following April 13. The court awarded Wife $75,000 alimony *in solido* for her interest in the appreciation of the Indiana property. The trial court then awarded Wife $1,500 per month in transitional alimony for a period of 60 months (or upon her receipt of a portion of Husband's pension, whichever occurred first). Finally, it awarded Wife $25,000 as alimony *in solido* for attorney's fees based in part upon Husband's dilatory tactics throughout discovery and trial. It also awarded to Husband a $38,749 loan to DMF Properties, Inc., and credited $7,500 to him for his dissipation of marital assets in furtherance of an extramarital affair.

According to the trial court's valuations, it awarded to Wife $220,525, or 51% of the net marital estate, and it awarded to Husband $212,118, or 49% of the same. These figures included the allocation of marital debt to the parties; the alimony awards for attorney's fees and appreciation of the farmland; the assessment of $7,500 to Husband for the dissipation of marital assets; and the loan to DMF Properties, Inc.[3] In contrast to the roughly equal division of marital assets, the listing of separate assets reflected a significant disparity: Husband owned separate assets valued at approximately $699,678, whereas Wife's separate assets totaled approximately $97,356.

Wife filed a motion to alter or amend before entry of the final order, and Husband filed a 23-page motion to alter or amend two weeks after entry of the final decree. The trial court denied both

---

[1]The parties dispute the exact amount of Wife's income. The trial court never made a specific finding regarding this point but focused instead on the relative difference between her income and Husband's earnings. The record reveals that her 2007 income was roughly $70,000, but for the sake of analysis here, we will use the $72,914 figure urged by Husband. Ultimately, however, this proves to be a distinction without a difference.

[2]We note that in his amended responses to the first set of interrogatories, Husband reported a gross earned income of $166,719 for the first three quarters of 2006.

[3]We note that this calculation did not account for the equal division of the equity in the marital residence.

motions and ordered Husband to pay $1,500 of Wife's attorney's fees incurred in defending against his motion to alter or amend. Husband then filed his notice of appeal on July 9, 2007.

### *Issues Presented*

Husband raises the following twelve issues on appeal:

1.     Whether the trial court erred in identifying the appreciation of the Indiana farm land commonly known as the Cass County and White County properties as marital property rather than the appreciation of DMF Properties, Inc., where DMF Properties, Inc., was stipulated to be the owner of the Indiana farm land;

2.     Whether the trial court erred in finding that there was a substantial contribution by Wife to the appreciation of the Indiana farm land;

3.     Whether the trial court erred in including $254,000, the stipulated appreciation of the Indiana farm land, as a marital asset;

4.     Whether the trial court erred in ordering Husband to pay to Wife alimony in solido in the amount of $75,000 to represent Wife's marital interest in the appreciation of the Indiana farm land;

5.     Whether the trial court erred in including Husband's debt to DMF Properties, Inc. of $38,749 in the marital estate and in awarding this "asset" to Husband;

6.     Whether the trial court erred in identifying pocket change which was being saved for the college education of Husband's grandchild as a marital asset and in valuing said pocket change at $5,000;

7.     Whether the trial court erred in awarding Wife transitional alimony in the amount of $1,500 per month for a period of 60 consecutive months;

8.     Whether the trial court erred in finding that Husband dissipated marital assets totaling $7,500 and in awarding this sum to Husband as a division of marital property;

9.     Whether the trial court erred in ordering Husband to pay the sum of $25,000 to Wife's attorney for attorney['s] fees and suit expenses;

10.     Whether the trial court erred in awarding Wife attorney['s] fees in the amount of $1,500 allegedly incurred by her in defending against Husband's motion to alter or amend;

11.    Whether the trial court erred in denying Husband's request for attorney['s] fees associated with the filing and presentation of his motion to alter or amend and his defense of Wife's motion to alter or amend; and

12.    Whether Husband should be awarded his attorney['s] fees incurred in prosecuting this appeal.

In stark contrast, Wife raises only one issue for our review, as follows:

[Whether Wife should] be awarded her reasonable attorney['s] fees and suit expenses incurred in defending this appeal.

### *Standard of Review*

This case primarily involves a dispute over the classification, valuation, and division of marital assets, all of which are questions of fact. We accord great weight to the trial court's division of marital assets and will not disturb that decision unless "the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). Indeed, we review the trial court's factual findings *de novo* on the record with a presumption of correctness and will overturn them only when the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court's factual findings rest on its assessment of a witness's credibility, we will re-evaluate the assessment only when clear and convincing evidence to the contrary exists. *Sircy v. Metro. Gov't of Nashville*, 182 S.W.3d 815, 818 (Tenn. Ct. App. 2005) (citing *Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999)).

Husband also challenges the trial court's award of transitional alimony and alimony *in solido* for attorney's fees. Because the form and amount of an alimony award lies within the sound discretion of the trial court, appellate courts will not overturn such awards absent an abuse of discretion. *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007); *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). Additionally, an award of attorney's fees is within the trial court's discretion, and this Court will not interfere with such an award absent a clear showing of an abuse of discretion. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn.1995) (citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992); *Crouch v. Crouch*, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

In contrast to the above standards, no presumption of correctness attaches to a trial court's conclusions of law. *Keyt*, 244 S.W.3d at 327.

*Analysis*

Although Husband raises numerous issues on appeal, the primary points of dispute in this case involve two tracts of Indiana farm land owned by DMF Properties, Inc., of which Husband is 100% shareholder, and the $75,000 award of alimony *in solido* to Wife for her interest in the appreciation of that separate property. Husband also contends that the trial court erred in including a $38,749 loan to DMF Properties, Inc. as a marital asset and awarding it to him.

Additionally, Husband asserts that an award to Wife of attorney's fees in the amount of $25,000 was error; that Wife does not need transitional alimony in the amount of $1,500 per month; that he did not dissipate assets in the amount of $7,500 (although he plainly admits the extramarital affair); and that his "pocket change" was a separate asset totaling far less than $5,000. He further challenges the trial court's award of $1,500 in attorney's fees to Wife for having to defend against his motion to alter or amend. Finally, both parties seek attorney's fees on appeal. We now turn to each issue raised by Husband.

## I.     *DMF Properties, Inc. and the $75,000 Award of Alimony in Solido*

Husband disputes the court's valuation of his interest in the land as well as its classification of the increase in market value as marital property. The parties stipulated that the land had increased in value by $254,000 during the course of the parties' marriage. The trial court found $186,000 of the land's value to be separate property and the increase of $254,000 to be marital property. The parties do not dispute these values on appeal. Instead, Husband contends that the asset in question is his stock in DMF Properties, not the land itself; according to Husband, because Wife introduced no evidence as to the increase in value (or value at all) of the stock, the trial judge's award of $75,000 of alimony *in solido* was in error. Husband asserts that even if the asset in question were the land itself, Wife did not contribute to its appreciation in value and cannot claim it as marital property.

The trial court awarded Wife $75,000 in alimony *in solido* for her interest in the appreciation of the farm land owned by Husband through his closely held corporation, DMF Properties, Inc. When the court rendered its bench ruling to this effect, it stated as follows:

> With reference to the division of marital assets, the wife claims a marital interest in the Indiana farms owned by the husband through DMF Properties, Incorporated. The value of DMF Properties, Incorporated is really the value of the farm land. The amount of appreciation of the land stipulated by the parties is 254,000 dollars.

> The husband consistently spent marital funds for the maintenance, upkeep and taxes on the Indiana properties. In addition, the wife's contributions as a wage earner during the marriage enabled the husband to spend marital income on preserving and improving the Indiana property.

While the wife was employed, she planned her vacation time in a manner that allowed her to travel with husband to seminars and conventions to help him in promoting his books and traveled with him to conduct research, interviews, and the wife entertained for the husband. While laid off from her employment, the wife worked during the marriage as homemaker and further contributed to husband's writing career.

The Court has considered the duration of the marriage, the parties' age, their physical and mental health, their vocational skills, their earning capacity, their estate at the time of the marriage, and now, the financial liabilities and the financial needs, the relative ability of each party for future acquisitions of capital assets and income, each party's contributions to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property including contributions as homemaker or wage earner, the value of the parties' separate property, the economic circumstances of each party and the amount of social security benefits available to each party.

Considering all these factors, the Court orders the husband to pay to wife the sum of 75,000 for her marital interest in the appreciation in the Indiana farms.

We now turn to the arguments Husband has advanced, addressing first the threshold question of classification.

### *Classification of the Appreciation in Husband's Stock in DMF Properties, Inc.*

Husband contends that the increase in land value was attributable solely to market conditions and that the appreciation in value is his separate property. He asserts that Wife had nothing to do with the property and, in fact, had never seen it before. He leases the property to a tenant farmer and shares the expenses of crop production with him, routinely paying the expenses in advance. According to his agreement with the tenant farmer, the tenant farms the land and supplies equipment, labor, and fuel. Husband splits the cost of seed and fertilizer and receives half the proceeds in return. Wife contends that marital funds were used for the advance payment of expenses and that those payments constituted a contribution to the land's preservation and appreciation in value. She also highlights her employment outside the home for eleven years, her assistance in proofreading her husband's work, and her entertaining his business colleagues.

The Tennessee Code provides that the income from and the appreciation in value of a spouse's separate property can become marital property where both spouses have substantially contributed to its preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B) (2005). Those contributions may be direct or indirect. Tenn. Code Ann. § 36-4-121 (b)(1)(D) (2005. Even so, they must be both "real and significant" and connected in some way to the asset's appreciation in value. *Keyt v. Keyt*, 244 S.W.3d 321, 329 (Tenn. 2007).

In this case, the sole asset of the corporation, which is itself wholly owned by Husband, is farm land.[4] Even though there is a farm checking account, it appears that farm-related funds and marital funds were sufficiently commingled in that account so as to render it a marital asset. On cross-examination, Husband conceded that over the course of nine years, $150,499 of marital funds were deposited into this account. He further testified that over that same period he paid between $18,000 and $19,000 of family expenditures from the farm account. Husband also proffered evidence at trial that marital funds had gone toward crop production expenses, including seed, fertilizer and the like. Yet, he argues that the income from the crops have always exceeded the (advanced) expenses and have enriched the marital estate by approximately $68,000.

There was no testimony at trial that the increase in value was solely market driven, and Husband testified that there was no development potential for the land. Husband and Wife dispute the amount spent on ditch improvements on the land. Husband conceded that approximately two to three years prior to trial, he split the cost of digging drainage ditches with the tenant, but he could not recall the amount spent on the project. In response to Wife's allegation that they had spent $30,000 on ditches, Husband stated that they had discussed making those improvements but never did.

The trial court found that Husband had paid for the upkeep, for improvements, and for taxes on the farm from marital funds. The record contains additional support for this finding, including copies of checks for tax payments.[5] We cannot conclude that the evidence preponderates against the trial court's implicit conclusion that Wife made substantial contributions to the preservation and appreciation of the farm land. In this case, Husband not only advanced crop production expenses to the tenant farmer, but he and Wife apparently bore the risk as well, agreeing to split the proceeds rather than collect a fixed rent. We have no doubt that the continued profitability of a farm operation serves to increase the land's value, particularly where the only apparent use of the land is farming.[6] The routine advance of expenses for the farming operation is, in our opinion, a real and substantial contribution made through the use of the Fickles' marital funds. Further, they paid the property taxes from marital funds. Finally, although they offered conflicting testimony regarding ditch improvements to the property, we can only presume that the trial court based its conclusion on a credibility assessment of Husband and of Wife and a determination that Wife's testimony proved more persuasive. We are hard pressed to find clear and convincing evidence to the contrary.

---

[4] Husband stated that the "only asset of DMF is the land."

[5] The record includes checks written to the county treasurer for $968.41 and $9,868.41, as well as a check written on a joint account to the United States Treasury (for 2002 taxes related to the farm) in the amount of $2,077.75.

[6] For example, a key criterion noted in both appraisals of the farm land was soil productivity. We also note that both appraisers agreed that the highest and best use of the land was to farm it.

### *Valuation of the Stock's Appreciation*

Husband vigorously challenges the trial court's valuation of the appreciation in DMF Properties, Inc., stock. At trial, Husband's expert testified that the value of the stock at the beginning of their marriage was $139,380, but that as of November of 2007, it was worth $286,387[7], notwithstanding the increase in value of the land. The expert explained that several factors connected with valuing corporate stock impacted these numbers: that fair market value contemplates a sale of the asset; that a sale of the land would result in the levy of significant taxes, including capital gains taxes, thus reducing the value of the corporate stock; that, if the proceeds were distributed to the shareholder, they would again be taxed at the dividend or normal income tax rate; and that a valuation of the stock of a closely held corporation would require a 15-25% discount for marketability. On cross-examination, the expert stated how he arrived at the lower figure: he reduced the appraised value of the land by the corporate debt owed to Husband ($38,749, as listed on the tax return), further reduced it by some $64,000 of estimated taxes upon the sale of the land, and then discounted that value by 15% for marketability. Husband had testified that he had no intention of selling the property; the expert conceded this fact and explained that, nonetheless, the net asset method contemplated a sale of the land.

Rather than adopt the expert's valuation of the corporate stock, the trial court instead used the stipulated land value that was based upon recent appraisals. The trial court concluded that "[t]he value of DMF Properties, Incorporated is really the value of the farm land. The amount of appreciation of the land stipulated by the parties is 254,000 dollars." In *Powell v. Powell,* this Court addressed the question of how to properly value a closely held corporation for this very purpose:

> [In *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn. Ct. App. 1987), this Court] opined that "[d]etermining the value of a closely held corporation is not an exact science[,]" . . . and that "[t]here are a number of acceptable methods available to determine the value of a corporation." . . . The choice of the proper method or combination of methods depends upon the unique circumstances of each corporation.

*Powell v. Powell*, 124 S.W.3d 100, 104 (Tenn. Ct. App. 2003)(citations omitted). In this case, the trial court was clearly not persuaded by Husband's expert to adopt the lower stock value as he had proposed. In valuing a marital asset, the trial court may assign an asset value within the range of values supported by the evidence. *Id.* at 105. The evidence does not preponderate against the trial court's adoption of the stipulated appreciation in value where the land is the sole asset of the corporation, which is itself wholly owned by Husband.

---

[7]In using the net asset method of valuation, the expert relied upon the land appraisals provided by the parties and upon the corporate tax returns.

*Treatment of Corporate Debt*

Husband additionally argues that the corporate debt of $38,749 payable to him should either be deducted from the stock value or eliminated as a marital asset. This loan became an issue by virtue of Husband's expert's use of the corporate tax return. There is no evidence in the record regarding what use was made of the loan proceeds. In fact, Husband, the sole shareholder, testified that he was not even aware of the loan and described it as an "accounting procedure."

We find that Husband's argument regarding the valuation of the stock lacks merit. However persuasive Husband's argument regarding the award of the loan to him may be – and even assuming the award was error – we are still unable to conclude that the trial court's division of the marital estate was inequitable.

## II. $7,500 Assessment for Dissipation of Marital Assets

Husband additionally challenges another factor impacting the division of the marital estate: the trial court's assessment of $7,500 to him for dissipation of marital assets. There is no dispute that Husband engaged in an extramarital affair prior to the time of trial. Wife listed $7,500 as a marital asset in her Rule XIV(c) affidavit, indicating that Husband had spent at least this much in travel expenses and gifts for his paramour. In his amended answers to the first set of interrogatories, Husband listed the following trips he took with Jean Oury (Ms. Oury) and the expenses he incurred:

On a trip to Alaska in July of 2005, Husband paid Ms. Oury's airplane ticket. He also paid for some meals and entertainment in the amount of $1,000.

In February of 2006, Husband traveled to Little Rock, Arkansas, with Ms. Oury but stated that the Forest History Society paid for everything.

In May of 2006, he traveled to Indianapolis, Indiana, and listed $300 as total expenses.

In July and August of 2006, Husband again traveled to Alaska with Ms. Oury and paid for her airfare (approximately $1,000) and for some sightseeing excursions.

In August of 2006, Husband traveled to Connecticut and New Hampshire with Ms. Oury. He asserted that she paid for her own airfare but that Yale University paid for the rest of the trip.

On three occasions in September and October of 2006, Husband took Ms. Oury to Baton Rouge, Louisiana for LSU football games. He estimated each trip to cost approximately $400 each.

At trial, Wife provided a listing of Husband's expenses compiled from his financial records from January to October of 2006. In February of 2006, Husband spent $100 at Gould's Day Spa. Ms. Oury testified that Husband had purchased a Gould's gift certificate for her, and Wife testified he had never given her anything from Gould's.

The exhibit provides an extensive list of March 2006 expenses totaling $5,437.42 incurred on Husband's trip to Utah, New Mexico, and Oklahoma. It also reveals $550 for Orpheum tickets; May 2006 expenses totaling $543.38 on a trip to Indiana; $727 of expenses incurred at the Indy 500; another $321.16 incurred on a trip to Indiana; expenses associated with trips to Pennsylvania, Oregon, and Alaska totaling $8,867.87; $2,209.78 spent on a trip to Connecticut and New Hampshire; $3,424.19 in expenses related to three trips to Baton Rouge, Louisiana; and $427 spent on Grand Prix tickets. These expenses total $22,689.80. Wife also provided a similar breakdown for 2005, and that list included a $500 charge in November for Orpheum tickets as well as at least $5,000 in cumulative expenses related to Baton Rouge trips.

Ms. Oury testified that Husband had spent money on her but could only be as specific as "a lot less" than $10,000. She confirmed that they traveled twice to Alaska: the first time he paid for her airfare, for the room, meals, tours, and excursions. On the second trip, Ms. Oury testified that she paid for her own airfare. She also stated that they traveled to Utah in March of 2006, and Husband drove her there and paid for her meals. She confirmed that they traveled to Indianapolis in May of 2006, and later to Connecticut and New Hampshire, although she paid her airfare. She conceded that he purchased Orpheum tickets for them, took her to LSU games approximately five or six times, and gave her some jewelry, gift certificates to Talbots and Gould's Day spa, and a cloak.

When asked how much money he had spent on Ms. Oury in total, Husband did not know, but testified that it was definitely less than $25,000. When asked if it was more or less than $5,000, Husband conceded he could not say. Husband testified that, with the exception of the LSU visits, all of his trips were work-related; that his expenses were paid for by the various organizations sending him to those locations; and that Ms. Oury usually stayed in his room, thus avoiding any additional expenses to him. As for the LSU games, Husband testified that he had always traveled to Baton Rouge for the games and that Ms. Oury's presence there added very little to his usual costs.

For example, Husband testified as follows:

I bought [Ms. Oury] an airplane ticket for the first trip to Alaska. And that was I think – I know it was under $1,000. The rest of that trip was expense, so I spent nothing. We did take a couple of little side trips and little cruise things. Those were $150, $200. Something like that. Meals, I don't know how you would total that. But as I said, that was mostly expense.

Husband addressed each trip, including the LSU games, the trip to Arkansas, and the trip to Connecticut and New Hampshire, in this fashion. In essence, he stated that most of the travel costs were covered by the sponsoring organization[8] of the research he was conducting in those locations.

Among the factors that courts may consider when fashioning an equitable division of a marital estate is a party's dissipation of the marital or separate property. Tenn. Code Ann. § 36-4-121(c)(5). Even though no statutory definition of "dissipation" exists, the term has a common meaning in the context of divorce. The concept of dissipation is based on waste. . . . Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down. . . . Dissipation involves intentional or purposeful conduct . . . that has the effect of reducing the funds available for equitable distribution. . . .

Whether a particular course of conduct constitutes a dissipation depends on the particular facts of the case. . . . The party claiming that dissipation has occurred has the burden of persuasion and the initial burden of production. After the party alleging dissipation establishes a prima facie case that marital funds have been dissipated, the burden shifts to the party who spent the money to present evidence sufficient to show that the challenged expenditures were appropriate.

*Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005)(citations omitted).

In this case, Wife made a prima facie case of dissipation of marital assets. There is no question that Husband traveled extensively with Ms. Oury or that Husband spent marital funds in furtherance of an extramarital affair. Wife submitted detailed financial information regarding Husband's expenses on various trips he undisputedly took with Ms. Oury. Husband did not calculate an exact amount to counter Wife's estimate of $7,500, but instead testified that the majority of his expenses on those trips were paid by the organizations that had hired him to conduct research. Although this makes sense in theory, Husband never proffered any financial information showing the reimbursement of the expenses reflected on his personal accounts. Given our standard of review, we cannot say the evidence preponderates against the trial court's assessment of $7,500 to Husband for the dissipation of marital assets.

### III.    *Award of $5,000 for Cash on Hand*

Husband also takes issue with the trial court's award of $5,000 of "cash on hand" to him in the division of the marital estate. In her Rule XIV(c) affidavit, Wife listed $5,000 of "cash on hand" as a marital asset. By "cash on hand," Wife meant a change collection that Husband had saved over the course of their marriage. Although Husband neither listed this money in any form prior to trial

---

[8]For example, he asserted that Yale University paid for his trips to Connecticut and New Hampshire and that the U.S. Forest Service paid for his research trips to Alaska and to one trip to Baton Rouge.

-11-

nor counted it before the trial's conclusion, he did testify that the total was less than $5,000. He further stated that the money was his separate property because, consistent with his family tradition, he was saving it to give to his grandchild for college spending money. Wife testified that Husband always saved whatever change he had and collected it throughout their marriage. She was uncertain as to the true amount and had arrived at $5,000 by approximating a dollar per day for the thirteen years they were married. Then, in an affidavit accompanying his motion to alter or amend the judgment, Husband asserted that he had counted the money and discerned that it totaled approximately $1,100.

Husband first contends that the money is his separate property because he intended to give it to his grandchild for college expenses. Yet, he neither cites authority nor advances any argument explaining why an intention to give away cash on hand should transmute the cash from marital property to separate property. We find this argument lacks merit. Husband next contends that the trial court erred in valuing the amount of cash on hand. We agree that Wife's testimony regarding the value is speculative at best. Nonetheless, such a valuation error would not render the division of marital property inequitable.

## IV.   *Transitional Alimony and Alimony in Solido for Attorney's Fees*

The trial court awarded to Wife transitional alimony and alimony *in solido* for attorney's fees. When rendering his bench ruling on both awards, the trial judge stated as follows:

> With reference to spousal support, the parties' divorce leaves the wife in an economically disadvantaged financial position. She has virtually no separate property upon which she may rely as additional financial support or to be used in paying for her attorney's fees in this matter.

> The husband earns substantially more income than the wife. The husband is not economically disadvantaged. He receives income from his 37-year employer, various book deals, social security income, Yale University, and income from his separate property.

> The Court has also considered the parties' age[s], their mental and physical condition. I think their ages are 67 and 61, respectively. The husband is 67 and the wife is 61. They are both in relatively good mental and physical health. I have considered the standard of living they established during the marriage. They enjoyed a fairly high standard of living, relatively speaking.

> The Court has considered the duration of the marriage – they married in 1993, I believe it was – and the parties' separate assets. The wife has shown a need for spousal support in order to adjust to the economic consequences of the divorce. Again, the parties were married 14 years. The husband, again, has a greater earning capacity and a greater capacity to acquire future assets than the wife does.

-12-

The Court finds that rehabilitation in this case is not necessary, but the Court, again, finds the economically-disadvantaged wife needs assistance to adjust to the economic consequences of this divorce.

The Court will order the husband to pay transitional alimony in the amount of [1,500] for the period of 60 months . . . . The payments will terminate upon the date the wife begins receiving her share of the husband's monthly retirement benefits after his retirement from his employment with the State of Tennessee. The payments will also terminate upon the death of the wife but not upon the death of the husband.

Regarding attorney's fees, since the divorce will leave the wife at a financially disadvantaged position relative to husband, wife is in need of an award of attorney's fees and husband has the ability to pay attorney's fees.

In addition, husband has not been forthcoming in his responses to interrogatories and his testimony before the divorce referee and in his deposition testimony. This has required the wife to dig further and to do a great deal more work through her attorney than would have been required if husband had simply been honest and forthcoming in his answers and provided the information requested without requiring wife to file motions to compel answers to interrogatories.

The wife has incurred attorney's fees of approximately 30,000 dollars exclusive of the fees incurred for the two-day trial. She has also incurred expenses of approximately 3,500 dollars. The Court orders the husband to pay the wife 25,000 in attorney's fees as alimony *in solido*.

### Transitional Alimony

Husband challenges the transitional alimony award by arguing that Wife is not financially disadvantaged. He charges that by applying only $69,000 of her $120,000 proceeds from the marital residence toward her new home, she inflated her monthly house note and her monthly expenses. Husband further argues that Wife had no significant debt and estimated her 2007 salary to equal $72,913.

Because the form and amount of an alimony award lies within the sound discretion of the trial court, appellate courts will not overturn such awards absent an abuse of discretion. *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007); *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). The relevant statutory factors the trial court must consider when deciding whether to award alimony include the following:

(1) The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and all other sources;

-13-

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i)(2005).

The most important factors are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002); *Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001); *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). Of these two factors, the disadvantaged spouse's need is the threshold consideration. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App.1999).

The record reveals that from the University of Memphis, Yale University, and Social Security, Husband earned a minimum of $145,000 per year. This figure does not include the portion of his $125,000 book advances *actually* earned at the time of trial (he had completed somewhere less than half of the work), nor did it include annual income from DMF Properties, Inc. Husband expects to receive an additional $75,000 upon completion of the two books under contract and has several other book contracts. Moreover, according to the trial court's calculations, Husband owns approximately $699,678 in separate property.

Husband stipulated to inappropriate marital conduct but testified to and made no secret of his extramarital relationship in public. As already discussed, Husband also dissipated marital assets in furtherance of that affair.

In contrast, Wife earned approximately $72,000 in 2007 from First Tennessee. The value of her separate property totaled approximately $97,356, $79,500 of which was attributable to the equity in her new home. Although Husband makes much of her use of only $69,000 for a down payment on her home and of the disappearance[9] of the remaining $51,000, this difference does not alter the trial court's conclusions regarding Husband's superior earning capacity, the disparity in separate assets, Wife's need for financial assistance, the parties' marital standard of living, or Husband's extramarital affair. The trial court expressly considered the statutory factors in making this award, and we cannot conclude that the trial court's award constitutes an abuse of discretion.

### *Attorney's Fees*

Husband also challenges the trial court's awards, $25,000 and $1,500 respectively, of attorney's fees to Wife. It is well settled that an award of attorney's fees constitutes alimony *in solido*. *See Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). Additionally, an award of attorney's fees is within the trial court's discretion, and this Court will not interfere with such an award absent a clear showing of an abuse of discretion. *Aaron*, 909 S.W.2d at 411 (citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992); *Crouch v. Crouch*, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

Such an award is appropriate when the one seeking attorney's fees lacks sufficient funds to afford his or her own legal expenses, *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or would have to deplete his or her resources in order to pay them. *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, the court may properly order the husband to pay the wife's attorney's fees where the record supports the wife's need for such an award and the husband's ability to pay it. *See Riggs v. Riggs*, 250 S.W.3d 453, 460 (Tenn. Ct. App. 2007); *Harwell*, 612 S.W.2d at 185.

We find no abuse of discretion in this award. As noted by the trial court, the record is replete with examples of Husband's refusal to produce documents, omission of information, provision of inaccurate discovery responses, and general dishonesty in the proceedings. We find no abuse of discretion when, as here, one spouse's obstructionist tactics force the other, economically disadvantaged spouse to incur substantial and unnecessary attorney's fees he or she would otherwise struggle to pay. *See Gillam v. Gillam*, 776 S.W.2d 81, 86-87 (Tenn. Ct. App. 1988) (awarding to wife $32,000 in attorney's fees, all but $5,000 of the total incurred, inflated in large part because of

---

[9] Wife contends she spent this amount of money as follows: approximately $15,487 on attorney's fees, $23,000 on repairs, maintenance, fixtures, and furniture for her new home, and the balance on living expenses including life insurance, homeowner's insurance, and car maintenance.

husband's dilatory tactics throughout the proceedings). We accordingly affirm the trial court's award of $26,500 for attorney's fees.

Both parties seek attorney's fees on appeal, but, exercising our discretion in this matter, we decline both requests.

### *Conclusion*

Given our standard of review and the deference accorded to decisions of trial courts in dividing marital estates and awarding alimony, we cannot say that the evidence preponderates against the property division in this case or that the awards of alimony constituted an abuse of discretion. The record reveals that the trial court noted and carefully weighed the statutory factors as required. Further, although the evidence might support another result, it does not preponderate against the one reached by the trial court.

For the foregoing reasons, we affirm the trial court's judgment. Costs of this appeal are taxed to the Appellant, James Edward Fickle, and his surety, for which execution shall issue if necessary.

_____
DAVID R. FARMER, JUDGE