IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 31, 2010 Session

## DAWN LYN TOUSIGNANT GORDON. v. ROBERT FRANK GORDON

**Appeal from the Chancery Court for Washington County**
**No. 9006      G. Richard Johnson, Chancellor**

_____

**No. E2010-00392-COA-R3-CV - FILED OCTOBER 27, 2010**

_____

In this divorce action, the trial court awarded Dawn Lyn Tousignant Gordon ("Wife") 59% of the marital estate, or approximately $231,100. It also ordered Robert Frank Gordon ("Husband") to pay Wife "permanent spousal support" of $2,200 per month. Husband appeals and challenges both the division of marital property and the court's award of alimony *in futuro*. We modify the trial court's division of marital property and its award of alimony. As modified, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

David S. Haynes, Bristol, Tennessee, for the appellant, Robert Frank Gordon.

Robert D. Arnold, Johnson City, Tennessee, for the appellee, Dawn Lyn Tousignant Gordon.

**OPINION**

I.

A.

Husband and Wife were married 17 years. When they married, they were both pilots for American Southeast Airlines ("ASA"). Approximately 6 months into the marriage, Wife sustained a "breakdown." The tranquilizers she took, described by her as "the Valium umbrella," disqualified her from flying. She lost her job. She did not work again as a pilot until 2006. Husband continues as a pilot for ASA.

By the time of the divorce, Husband was earning approximately $10,000 per month. His seniority permitted him to pick the most attractive (to him) flight routes and schedules. As of the time of trial, the parties had accumulated approximately $389,600 in marital assets, excluding the marital residence. By far, the largest components of the marital estate were the parties' respective retirement accounts. Wife began the marriage with $20,000 in her retirement account and added $62,000 during the marriage for a total of $82,000 at the time of the trial. Husband began the marriage with $50,000 in his retirement account and increased it by $308,781.26 for a total of $358,781.26 by the time of the divorce. Wife was awarded total assets valued at some $231,100. Husband was ordered to pay credit card debt of $9,000 which left him with a net award of approximately $158,500.

One particular asset that Husband sought in the divorce was a farm tractor given to the couple by his parents in 2000. By the time they purchased their acreage and built their home, they could not afford a tractor. The tractor was worth approximately $5,000 at the time of trial. During the marriage, the parties built a shed for the tractor and purchased implements worth approximately $1,200. In her pre-trial submissions required by local rule, Wife *agreed* that Husband should receive the tractor and equipment as part of his distribution. Husband had learned to operate a tractor on the family farm and wanted to teach his son how to operate one.

The marital residence and lot were worth approximately $400,000 by an appraisal current at the time of trial. The property was encumbered by debt of approximately $370,000. Neither party wants the real property. They agreed that it should be sold and any equity divided by the court. In the meantime, Husband continues to service the debt by making payments of approximately $2,400 per month on the first mortgage and home equity line of credit.

Wife asked for "permanent" spousal support. Wife's proof at trial was that her monthly expenses are $4,973, not including housing. She makes $400 a month as a personal trainer. Under the agreed parenting plan, she receives monthly child support of $1,509 for the two minor children. Also, Husband pays $160 per month for medical insurance for the children.

Husband conceded at trial that Wife would have a financial need that should be satisfied with alimony. Husband's position was that once the sale of the marital home lifted the debt service obligations off him, he would be able to pay alimony. Husband offered proof that Wife remains licensed as a pilot and employable as a pilot, where she could earn, according to Husband, $20,000 per year starting salary increasing to $40,000 per year in two to three years. According to Husband, the parent company of ASA is hiring, and he believes Wife would be hired within a year of the trial date. He agrees that she would need to log

approximately 50 hours of flight time to be current. Also, Husband pointed out that Wife has a college degree.

Wife took a job as a pilot in 2006, but the job did not work out. She testified that she was not able to complete the initial training administered by the employer because of interference from Husband. According to Wife, Husband would call her distraught, shaming her for leaving the home and the children. The son, Crew, is a special needs child. He was diagnosed with ADHD. He was 14 years old at the time of trial, but, in 2006, he was only 11. His sister, Katherine, was 12 at the time of trial. Husband disputed Wife's characterization of the calls, but conceded that Crew's special needs posed a problem in 2006. The child's needs included careful monitoring of his medications and tutoring. Husband maintains that Crew was much improved at the time of trial. Wife acknowledged that Crew was doing much better then. She found that when she was the person doing the tutoring, Crew "tries to use my brain." After consultation with a teacher and the principal at the school where Crew attends, Wife decided to "take myself out" of the role of tutor. Also, after 2006, the parties began Crew on a regimen of expensive homeopathic medicines. According to Wife, "the difference was amazing" in a good sense.

Wife returned to flying with a small company (not ASA) in 2008, but her tenure was short-lived. Shortly after her employment, she was stranded in Atlanta and accepted her male co-pilot's invitation to stay overnight at his home. His wife was present at all times and nothing inappropriate happened. Nevertheless, she was fired along with the male pilot. The company expected them to stay in a motel where they could be contacted. At trial, Husband did not have any criticism of Wife's actions and testified as a senior pilot with ASA that the termination would not affect her employability.

Wife agreed that if ASA were hiring, it would hire her back, provided she logged the 50 hours of flight time needed to bring her resume current. However, Wife testified that she had submitted numerous applications and that none of the airlines were hiring. The airlines she had contacted were downsizing and had closed their hiring offices. ASA, according to Wife, had approximately 100 pilots on furlough and would not hire her until those pilots were reactivated. Wife admitted that her age at the time of trial, which was 47, did not pose a problem. She can fly until she is 65. Even though Husband insisted that Wife should be able to secure a job as a pilot for ASA, he testified that ASA was downsizing to the point that he had to scramble and take extra flights to be able to keep his income at the present level.

The only witnesses were Wife and Husband. Wife was not cross-examined.

B.

The trial court found that Husband was guilty of inappropriate marital conduct based on Wife's testimony. The court found Wife to be "very credible on every subject, and I believe her." It did not state whether or not it was factoring Husband's fault into the court's consideration of the issue of alimony.

The court approved the parenting plan agreed upon by the parties, which set Husband's child support obligation at $1,509 per month. The court made the following findings with respect to alimony:

> [Wife] has a very obvious need. She's got $400 a month in income and nowhere to live. . . . . [Husband is] making about $10,000 a month and making the house payment of twenty some hundred dollars a month. Accordingly, the Court finds it's appropriate to award [Wife] permanent alimony . . . in the sum of $2,200 a month. Now one of the reasons that I'm making that permanent support is the Court finds that her job prospects are poor to nil. In addition, the Court finds that by the evidence today, it's very obvious that that special-needs child, [Crew], needs her at home, and it's obvious to this Court what happens when she's not home to take [care] of [Crew]."

The court stated that it had not ignored any of the relevant factors, but that it focused primarily on need and ability to pay. The court made the spousal support obligation effective "after the closing of the [sale of the] house."

The court ordered the marital home sold and any equity divided equally between the parties. The court expressed doubt as to whether there would be any equity after payment of the encumbrances, the realtor's commission, and the accrued interest – "[T]hat isn't going to be much, $5,000 to $10,000 each at the most." Husband was ordered to service all debt until the closing.

The court ordered Husband to pay the credit cart debt of approximately $9,000. The court worked through the parties' personal property, classifying the items as separate or marital. The end result was that Wife received approximately $231,100 worth of net marital assets and Husband received approximately $158,500 worth of the net. In terms of percentages, Wife received approximately 59% compared to Husband's 41%. As we have indicated, by far the largest component of marital property was the increases in the respective retirement accounts. The court treated the amounts in the accounts as of the date of the

-4-

marriage as separate property, and the increases during the marriage as marital property. The court awarded Wife 60% of the increase in Husband's account and Husband 50% of the increase in Wife's account. The court did not discuss in any detail its reasons for these percentages.

The court found that the tractor was a gift to the parties and therefore a marital asset. The court set the value of the tractor at $5,000 and the implements at $1,200, and awarded both to Wife. It stated,

> [Husband] is living with his mother and father in a town, as I understand it, just outside of Atlanta. Obviously, he has no need for the tractor. On the other hand, the parties have a large yard and acreage out there where the tractor can be used and where it's needed, and I award the tractor and those implements to [Wife] since she's going to be out there where the acreage is and where the grounds are.

The court did not mention Wife's agreement in her pre-trial submissions that Husband should receive the tractor and implements.

The court reduced it findings to a judgment, which Husband moved the court to alter or amend. The court denied the motion. Husband filed this timely appeal.

## II.

Husband identifies four issues some of which we have restated in our own words:

> Whether the award of "permanent" alimony was contrary to the evidence and an abuse of discretion.

> Whether the trial court erred in refusing to impute monthly income to Wife based on her proposed parenting plan filed with her complaint wherein she imputed to herself monthly income of $2,441.

> Whether the 41% distribution of marital assets to Husband was contrary to the evidence and an abuse of discretion.

> Whether the court erred in distributing the tractor and implements to Wife.

III.

A trial court's findings of fact are reviewed *de novo* accompanied by a presumption of correctness unless the evidence preponderates against the findings. Tenn. R. App. P. 13(d); **Union Carbide v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993). A finding of fact in a divorce case that turns on witness credibility is given great weight on appeal. **Fulbright v. Fulbright**, 64 S.W.3d 359, 364 (Tenn. Ct. App. 2001). We review awards of alimony and division of marital assets for an abuse of discretion. **Fickle v. Fickle**, 287 S.W.3d 723, 728 (Tenn. Ct. App. 2008). Even though the abuse of discretion standard is a deferential standard, the trial court's decision must "take the applicable law into account and must also be consistent with the facts before the court." **Estate of Brock ex rel. Yadon v. Rist**, 63 S.W.3d 729, 732 (Tenn. Ct. App. 2001). Accordingly, we review

> to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*Id*.

IV.

We begin with the issue of alimony. Husband concedes that Wife is entitled to "transitional" alimony, but argues that the amount and duration of the court's award constitutes an abuse of discretion. Husband argues that the evidence preponderates against the trial court's findings of fact (1) that Wife's employment prospects were "poor to nil" and (2) that she was needed at home with Crew to the point that she could not work as a pilot. Husband argues that the trial court failed to take into account the improvement in Crew's condition since 2006. Husband argues that, while the facts show that Crew's condition prevented Wife from working in 2006, she was again able to work by 2008 and, in fact, became employed as a pilot at that time. Husband argues that Wife's ability to fly translates into the ability to secure a job as a pilot by November 2010, earning $1,825 per month and the ability, by November 2012, to earn $3,650 per month as a pilot. He therefore seeks a reduction of alimony from November 2010 to November 2012 to $775 per month and a complete reduction by November 2012. Wife argues that the trial court's findings as to her employment prospects and Crew's situation are fully supported by the evidence. Therefore Wife insists there is no abuse of discretion in the trial court's alimony award.

We agree with Husband that the evidence preponderates against the trial court's factual findings on the issue of alimony. While there is certainly evidence of a downturn in the airline industry at the time of trial, the trial court translated a cyclical downturn into a permanent situation that will exist forever. Based upon a number of the relevant statutory factors, we hold that this case is not an appropriate case for an award of alimony *in futuro*.

Wife is a licensed airline pilot who has been trusted with a passenger airplane and up to thirty passengers at a time. She is also a personal fitness trainer. She attests to her own "industry" in her new venture, *i.e.*, personal trainer, saying that she does not sit and wait on customers but actively seeks them out and engages in any activity that will give her exposure to customers. She also testified that she almost single-handedly built the marital home with very little help from Husband. She told a similar story with regard to housekeeping and the raising of the children. She testified that personal fitness training is appealing to her because she likes to keep herself fit and healthy. The proof was to the effect that the nature of her airline terminations were such that her job losses would not be held against her. In short, Wife has considerable earning capacity; the problem is that she is temporarily without a well-paying job. Given her age, health, education, intelligence, skills, industrious nature, occupations and employment history, there is every reason to believe that her lack of a desirable job will be short-lived. To the extent the trial court's finding that Wife's employment prospects were "poor to nil" was meant to be a finding of impaired earning capacity, we hold that the evidence preponderates against that finding.

We also believe that the evidence preponderates against the finding that Wife needs to stay home with Crew. By her own testimony, he has had an "amazing" turnaround since the implementation of a new regimen of expensive homeopathic medication. Also, by her own testimony, she has stepped away from the challenging role of tutoring Crew to keep him from leaning too heavily on her knowledge. Finally, by her own testimony, she was able to take a job piloting passenger aircraft for a commercial airline in 2008. She lost that job, not because of her son's condition, but because of an unknown, unwritten company policy that she innocently violated. Thus, we hold that the evidence preponderates against the trial court's finding that Wife's earning capacity was destroyed or significantly impaired by Crew's situation.

These two factual findings change the landscape completely with regard to the relative financial positions of the parties and Wife's need for alimony. There is no doubt, as Husband concedes, that Wife had a need at the time of trial. But, since she clearly has significant earning *capacity*, there is no reason to believe that her need will continue indefinitely. The trial court's erroneous factual findings led to an abuse of discretion in awarding "permanent" spousal support. *See **Rist***, 63 S.W.3d at 732 (reviewing court should consider whether the "factual basis" for the decision is supported by the evidence).

-7-

The facts of this case allow us to make our own determination of the duration and amount of the alimony to be awarded. Husband in fact does not challenge the present (at the time of trial) monthly "need" of $2,200. This figure is supported by the preponderance of the evidence and we will not change it. We have already held that the trial court abused its discretion in finding Wife's alimony need to be "permanent." Therefore, there is no justification for "alimony in futuro," *i.e.*, "periodic alimony." *See* Tenn. Code Ann. § 36-5-121(f)(1)(2005). Further, there is no evidence in this case that Wife is in need of "rehabilitative" alimony. That type alimony is designed for a spouse who needs further education and/or training to give her or him earning capacity that is missing. *Id*. §36-5-121(e)(1). Rather, the instant case presents an ideal case for "transitional" alimony. "Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce . . . ." *Id*. §36-5-121(d)(4) and (g)(1).

Husband asks that it be determined that Wife will secure a job as a pilot one year from the date of the divorce, earning $20,000, increasing in two years to $40,000. In our view, this is as unrealistic as Wife's contention, and the trial court's finding, that she can never secure a job as an airline pilot. In light of the evidence in this case, and the factors[1]

---

[1]The statute states in pertinent part:

> In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(continued...)

set forth in Tenn. Code Ann. § 36-5-121(i) for determining the "length of term" of alimony, we modify Husband's alimony obligation to conform to the following: (1) Wife is hereby awarded transitional alimony in lieu of the trial court's award of alimony *in futuro*; (2) said alimony is set at the rate of $2,200 per month; (3) payments will commence on the first day of the first month following the closing of the sale[2] of the marital residence, but under no circumstances will the payments commence later than November 1, 2010; (4) payments made, if any, prior to the date of the release of this opinion will be treated as transitional alimony under the trial court's judgment as modified by this opinion; (5) in any event, Husband will pay transitional alimony to Wife in the stated amount from and after the release date of this opinion for 24 months, with the first of these 24 payments to be due and payable on November 1, 2010, for the month of November 2010, and with the last payment due and payable on October 1, 2012, for the month of October 2012; (6) it is the intention of this modification that no alimony will be due and payable after the payment due on October 1,

---

[1](...continued)

> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

> (7) The separate assets of each party, both real and personal, tangible and intangible;

> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;

> (9) The standard of living of the parties established during the marriage;

> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code. Ann. § 36-5-121(i).

[2]We do not know whether the marital residence has been sold. Our award of transitional alimony, and the terms of such, is not based on an assumption one way or the other.

2012; and (7) this award will absolutely terminate, without the necessity of a filing of a petition to terminate, upon the death or remarriage of Wife.

Husband raises the issue of whether the trial court should have imputed income to Wife based on the amount she imputed to herself in the proposed parenting plan. However, Husband provides us no authority for the proposition that the trial court or this Court is *bound* to the number she proposed. Further, Husband concedes in his brief that Wife's "real need" is paramount to her statements in the proposed parenting plan. We also note that Husband's "issue" is premised on the idea that income should be imputed because, but for her "misconduct," Wife would still have the job that she lost in 2008. However, Husband testified at trial that her actions did not offend him as a spouse and should not be held against her by prospective employers. Accordingly, we find no error in the trial court's failure to impute income to Wife based on the job she lost in 2008, which income represents the figure she furnished in her proposed parenting plan.

We turn now to Husband's argument that the trial court erred in failing to award him an equitable share of the net marital estate. Husband's argument is based largely on calculations in his brief that purportedly show that he is personally responsible for over 99% of the "direct economic contribution" to the marriage. By his figures, Husband contributed $1.8 million to the family unit compared to Wife's $178, 400. Husband argues that "the Facts, when matched to the 'Statutory Considerations for Equitable Distribution,' demand an equal division of the Marital Estate." Husband concedes that equity does not always require the division to be equal; he believes, however, that it should be in this case. Even if Husband's calculations are correct, we disagree.

Husband is correct that there are statutory factors that must be considered. The applicable statute instructs as follows:

> In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

-10-

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2005).

Husband's approach focuses on one portion of one factor, *i.e*, his economic "contribution"as a "wage earner."  A counterbalancing part of that same statutory factor instructs us to consider the contributions of Wife as a "homemaker" and "parent."  The proof in this case is that she invested a great deal of time and talent in both the home and a child with a challenging condition.  Another factor that weighs heavily in this case is the "economic circumstances of [Wife] at the time the division of property is to become effective."  At that time Wife had a definite and "real need" of approximately $2,200 per month which Husband concedes.  She was soon to be without a home for herself and her children.  We have considered the facts in light of the statutory factors and, with the exception of the tractor and implements, find no abuse of discretion in the trial court's allocation of the assets and debt.

-11-

We agree with Husband that the trial court abused its discretion in awarding the tractor and implements to Wife. The trial court acknowledged the source of the tractor. It was a gift from Husband's parents, who acquired it from Husband's brother. Husband testified that he learned to drive a tractor growing up on the family farm and he wanted to pass that skill on to his son. Wife agreed in her pre-trial submissions required by local rule that Husband would receive the tractor and implements. We are not holding that Wife's agreement necessarily bound the trial court or us, but we do hold that logic and fairness required the trial court to at least consider the source of the tractor and Wife's agreement that Husband receive the tractor absent a persuasive reason to do otherwise. The only reason the court stated for awarding the tractor and implements to Wife was that she would need it to care for the marital property and Husband would not need it since he would be living with his parents. The trial court's explanation does not comport with logic and fairness. Wife will only occupy the marital property until it is sold. Husband is unlikely to be a permanent tenant of his parents. He grew up on a farm and still aspires to have acreage and teach his son to operate a farm tractor. The tractor and implements should have been awarded to Husband, with the proviso that Wife can use it to maintain the marital property until it is sold. In the meantime, she should be responsible for any damage to the tractor and implements. The financial impact of our re-distribution of those assets is minimal and does not require a change in any other aspect of the property division.

V.

The judgment of the trial court is modified as set forth in this opinion. As modified, it is affirmed. Costs on appeal are taxed to the appellee, Dawn Lyn Tousignant Gordon. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment as modified by this Court and for the collection of costs assessed in the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE

-12-