FILED

OCT 31 2024

Clerk of the Appellate Courts
REc'd By _____

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 13, 2024 Session

## DANIEL SETH HOLLIDAY v. ELIZABETH FRANCES HOLLIDAY

**Appeal from the Circuit Court for Hamilton County**
**No. 22D0492            Michael Dumitru, Judge**

---

### No. E2023-01494-COA-R3-CV

---

In this divorce action, the trial court distributed the parties' assets and liabilities, determined the amount of the husband's child support obligation with regard to the parties' two children, and awarded alimony *in futuro* to the wife. The husband timely appealed. Upon our thorough review, we vacate and remand to the trial court the issues of the husband's child support and alimony obligations for further determination. We affirm the judgment in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

John P. Konvalinka, Ariel H. Resnick, and Lawson Konvalinka, Chattanooga, Tennessee, for the appellant, Daniel Seth Holliday.

Alan R. Beard, Chattanooga, Tennessee, for the appellee, Elizabeth Frances Holliday.

## OPINION

### I. Factual and Procedural Background

This action arises from a divorce between Daniel Seth Holliday ("Husband") and Elizabeth Frances Holliday ("Wife"). The parties were married on September 20, 2003, and subsequently had two children, J.H. and M.H., who were ages eleven and three, respectively, at the time the complaint for divorce was filed. The parties last cohabitated at a home on Norfolk Green Circle ("the Marital Residence") in Chattanooga. Husband is a fifty-four-year-old attorney, and Wife is fifty-two years old with a degree in philosophy

and three paralegal certificates. Although Wife was employed at various jobs during the marriage, she had not worked outside the home since 2018 at the time of trial.

It is undisputed that in late 2020, Husband began communicating with another woman. This relationship continued into 2021, and Husband informed Wife that he wanted a divorce on March 19, 2021.

On March 11, 2022, Husband filed a divorce complaint in the Hamilton County Circuit Court ("trial court") against Wife. In the complaint, Husband alleged that irreconcilable differences existed between the parties or, in the alternative, that Wife was guilty of inappropriate marital conduct. In addition, he requested to be named primary residential parent for the children and for the court to implement his proposed parenting plan. Husband also asked the court to equitably divide the parties' marital assets and liabilities and to set child support. On April 12, 2022, Wife filed an answer and counter-complaint, admitting that the parties had irreconcilable differences but alleging that Husband was guilty of inappropriate marital conduct. She additionally asserted that she should be named primary residential parent of the children. Wife further requested an award of alimony.

On April 27, 2022, Husband filed a motion seeking exclusive possession of the Marital Residence. Husband alleged that he was the primary caretaker of the children and that it was in their best interest to remain in the Marital Residence. Husband asserted that due to "heightened tension and disagreement between the parties," Wife should be ordered to leave the Marital Residence while he and the children remained. On June 14, 2022, the trial court entered an order denying Husband's motion for exclusive possession of the Marital Residence. In the same order, the trial court directed that Wife would have a "qualified supervisor when the children are having residential time with her."

On May 25, 2023, Husband filed an income and expense statement demonstrating that his monthly income from self-employment was $31,250.00 after a deduction for self-employment tax. Husband reported regular monthly expenses in the amount of $36,529.50. After the payment of his enumerated expenses for the parties and the children, Husband reported a monthly shortfall of $5,279.00.

Husband concomitantly filed an asset and liability statement. He subsequently amended this statement on August 11, 2023. In his amended statement, Husband valued the Marital Residence at $528,000.00 with a net equity of $217,778.00. The Marital Residence was the only real property asset identified. Husband listed other marital assets, including one personal checking account containing $261.00; two business checking accounts with a total combined value of $396.00; two cars—a 2020 Mercedes and a 2020 Lexus—each with a substantial remaining debt; his business, the Law Offices of D. Seth Holliday, valued at $25,000.00; and three life insurance policies valued at $31,470.00.

In his amended asset and liability statement, Husband also reported having substantial marital liabilities. He delineated loans that originated during the marriage, both personal and business, totaling $504,077.00. Husband also reported a significant amount of credit card debt incurred during the marriage on Wife's credit cards totaling $37,243.00. Husband reported marital liabilities totaling $541,320.00 such that the reported value of the marital estate was (-)$266,556.00.

On August 11, 2023, Husband also filed a proposed asset and liability allocation. He propounded allocating to Wife half of the equity in the Marital Residence; half of the funds in the personal checking account; all equity and liability associated with her vehicle, the 2020 Mercedes; and the entire amount of credit card debt. This proposal would have resulted in Wife's maintaining net assets valued at $69,450.00. To himself, Husband proffered allocating half of the equity in the Marital Residence; half of the funds in the personal checking account; all funds in the business checking accounts; all equity and liability associated with his vehicle, the 2020 Lexus; his business; all life insurance policies; and the liability for all of the business and personal loans. Such proposal would result in Husband receiving a net distribution valued at (-)$331,006.00.

Meanwhile, on May 30, 2023, Wife filed her asset and liability statement and proposed allocation. Wife identified several items of joint personal property to be distributed to her, including jewelry, various items of furniture, and a laptop computer. Wife proposed a split of (1) the personal and business checking accounts, which she claimed should be valued at over $139,000.00; (2) the equity in the Marital Residence; and (3) the value of the law offices. Wife also propounded that Husband assume responsibility for the credit card debt but failed to reference any business or personal loans.

On August 9, 2023, the trial court entered an order adopting an agreed permanent parenting plan ("PPP"). The PPP awarded the parties joint custody of the children and equal co-parenting time. The PPP stipulated that during Wife's co-parenting time, she "shall have a nanny/babysitter from 3:00 p.m. until 8:00 p.m. unless otherwise agreed upon by the parties." The PPP also stipulated that Husband would be responsible for continuing to pay "the children's tuition, costs, and fees associated with their school(s)"; the children's health and dental insurance; and any "[u]ncovered reasonable and necessary medical expenses."

On August 14, 2023, Wife filed her own income and expense statement reflecting that she had zero monthly income. In addition, Wife reported regular monthly expenses in the amount of $16,266.60 for herself and the children.

The trial court conducted a bench trial on August 23 and 25, 2023, and entered a resultant final decree on September 21, 2023. In the decree, the court found that J.H. suffered from a medical condition that caused severe behavioral issues, including verbal and physical outbursts. The court noted in its general factual findings that as a result of

- 3 -

caring for J.H., the parties' relationship had begun to deteriorate and that an "irreparable disconnect between" the parties had begun when Husband told Wife, "if you make me choose between you and [J.H.], I'll choose [J.H.]." Later in the decree, the court found that the parties had stipulated that grounds for divorce existed pursuant to Tennessee Code Annotated § 36-4-129.

The trial court considered the factors enumerated in Tennessee Code Annotated § 36-4-121(c) when dividing the parties' marital assets and liabilities. The court determined all of the parties' assets and debts to be marital, valued them, and divided them in a manner it deemed equitable. The court split the equity in the Marital Residence and the business and personal checking accounts equally between the parties. The court awarded each party his or her vehicle along with the associated debt and awarded Husband's business and the life insurance policies to him. Husband was allocated $601,171.50 in debts, and Wife was allocated debts totaling $143,703.07.

With respect to child support, the trial court determined that Husband earned $39,661.00 per month from his employment as an attorney and that Wife received zero income. The court based Husband's income amount on his 2022 IRS form 1099 ("the 1099 Form"), which the court found to be his "latest proof of income." The court noted that "Wife is not working and Husband has neither argued nor requested the Court impute any income to Wife on the basis that she is willfully unemployed." The court set Husband's child support obligation at $3,200.00 per month, attaching the applicable worksheet.

The trial court considered the factors enumerated in Tennessee Code Annotated § 36-5-121(i) when determining whether Wife should receive an award of alimony and the nature and amount of any such award. Within its analysis of the spousal support issue, the trial court relied on an income figure for Husband of $31,250.00 per month, taken from Husband's income and expense statement. The court found that Husband maintained the ability to pay "a significant amount of alimony" despite monthly debt payments of approximately $7,000.00 per month; his other reasonable monthly expenses totaling approximately $11,000.00; and his child support obligation of $3,200.00 per month. The trial court noted in its general factual findings that Wife had not worked outside the home since 2018 following a hospitalization "in connection with what she testified was a difficult pregnancy that led to significant hemorrhaging." The court also found that Wife had recently applied for more than ten jobs, one of which paid an annual salary of $80,000.00.

The trial court further found that the parties were of similar age and that neither party appeared to have any physical or mental impairments that would affect his or her ability to work in the future. The testimony at trial reflected that during the twenty-year marriage, Wife had cooked meals, cleaned the home, done laundry, and cared for the children in the home while Husband was the primary wage earner. To assist with the children's care, the parties had employed several nannies at a cost of approximately $5,000.00 per month. Both parties admitted to living an extravagant lifestyle and having

- 4 -

expenditures that exceeded their income. The court observed that "both Parties' standard of living will certainly decline as a consequence of this divorce." The trial court further determined that Wife had demonstrated a need for spousal support and was entitled to an alimony award after consideration of the pertinent factors, including "the undisputed relationship Husband carried on with another woman . . . which the Court finds contributed significantly to the downfall of the marriage."

Although the trial court acknowledged Tennessee's statutory preference for rehabilitative alimony, the court ultimately determined that "Wife cannot achieve, with reasonable effort, an earning capacity that will permit her standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to Husband." Finding that Wife maintained a need for alimony and that Husband had the ability to pay, the court awarded to Wife alimony *in futuro* in the amount of $9,500.00 per month from October 1, 2023, to December 31, 2024. The court determined that this would "afford Wife ample time and opportunity to reenter the workforce and make a salary commensurate with at least what she was earning when she left the workforce in 2018." The court ordered that beginning in January 2025, those payments would be reduced to $6,000.00 per month "to account for the income Wife will generate through her employment." Husband timely appealed.

## II. Issues Presented

Husband presents five issues on appeal, which we have reordered and restated slightly as follows:

1. Whether the trial court erred by citing J.H.'s behavior as a reason for the deterioration of the marriage when the parties stipulated that grounds for divorce existed.

2. Whether the trial court erred in its calculation of child support by failing to (1) deduct Husband's self-employment taxes and business expenses; (2) consider a deviation by reason of the children's extraordinary educational expenses; and (3) consider the children's health insurance costs, recurring uninsured medical expenses, and work-related childcare costs.

3. Whether the trial court erred by failing to impute income to Wife due to her alleged willful underemployment.

4. Whether the trial court erred by failing to include certain liabilities in its division of assets and liabilities.

5.    Whether the trial court erred by awarding to Wife alimony *in futuro* because the court failed to apply the relevant factors in determining Wife's alimony award and failed to consider Husband's ability to pay and Wife's potential income.

## III. Standard of Review

Our Supreme Court has explained the applicable standard of appellate review in a case involving the proper classification and distribution of assets incident to a divorce as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn Ct. App. 1996). When dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007).

This Court has described the proper standard of review for child support determinations as follows:

> Setting child support is a discretionary matter. Accordingly, we review child support decisions using the deferential "abuse of discretion" standard of review. This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is in the range of acceptable alternatives. While we will set aside a

discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

*State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2009) (internal citations omitted).

In a case involving issues of spousal support, our Supreme Court has elucidated the applicable standard of review as follows:

[A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470 [(Tenn. 2004)]; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (footnote omitted).

## IV. Fault for Deterioration of Marriage

Husband contends that the trial court erred by citing a child's behavior as a reason for the deterioration of the marriage when the parties had stipulated that grounds existed for divorce. Husband urges that when the parties have stipulated that grounds exist, pursuant to Tennessee Code Annotated § 36-4-129, the trial court is not required to state the underlying facts regarding fault. He further asserts that upon the parties' stipulation of grounds, fault is only to be considered in the context of alimony determinations and that to any extent fault could be relevant, it is the fault of the parties, not a child, that should be considered. Wife argues that the trial court did not err in citing J.H.'s behavior as a reason for the deterioration of the marriage because such behavior was relevant to the mental condition of Wife and was therefore within the discretion of the trial court to consider.

It is undisputed that the trial court did mention J.H.'s behavior as a reason for the deterioration of the marriage in its general factual findings. When providing a history of the parties' relationship in its final decree, the trial court stated that "[t]he Parties' relationship began to deteriorate in 2020 following a series of incidents involving [J.H.], who suffers from a medical condition causing severe behavioral issues[.]" The court then proceeded to make other factual findings concerning J.H. and the effect that caring for her had on the parties and the marriage, utilizing J.H.'s first name in its decree.

We note that the trial court has the statutory authority to consider the fault of the parties and the mental condition of each party when "determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment." *See* Tenn. Code Ann. § 36-5-121(i)(4), (11) (West April 25, 2011, to current). However, this authority obviously does not extend to consideration of the behavior or mental condition of a child (except to the extent that a child's behavior or mental condition might affect the mental condition of a parent).

Significantly, the trial court did not reference J.H.'s behavior at any point in its final decree beyond the general factual findings. As Husband points out, the parties had stipulated that grounds for divorce existed such that the trial court was not required to make factual findings concerning grounds. The trial court did not mention J.H.'s behavior outside of its recitation of the parties' history, and such factual findings carried no weight as to any of the issues before the court. We therefore conclude that the trial court did not abuse its discretion in its general recitation of the factual history of the marriage when the existence of J.H's behavioral issues was supported by the record and was cited on multiple occasions by the parties as posing a strain on their marriage. In this context, where the cited evidence was not relied upon by the trial court in its analysis of any of the issues addressed, we deem any error involving the trial court's recitation of such information in its order to have been harmless.

Husband is correct, however, that Tennessee courts do generally take steps to prevent the disclosure of sensitive information concerning minor children in public documents so as to avoid embarrassment to the child. *See, e.g., Bottorff v. Bottorff*, No. M2019-00676-COA-R3-CV, 2020 WL 2764414, at *9 (Tenn. Ct. App. May 27, 2020) (noting that when court records are public and unsealed, trial courts can issue a protective order concerning specific records to prevent potential embarrassment to a child); *In re Lucius H.*, No. M2016-00534-COA-R3-JV, 2016 WL 6462175, at *1 (Tenn. Ct. App. Oct. 31, 2016) ("In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity."). Upon remand, Husband may seek appropriate relief regarding this issue from the trial court via a post-trial motion.

## V. Child Support Award

Husband, who is self-employed, argues that the trial court erred in its determination concerning his child support obligation. Specifically, Husband urges that the trial court erred when it failed to (1) deduct the self-employment taxes he paid from his gross income amount, (2) deduct his reasonable business expenses from his gross income amount, (3) consider a deviation for the children's extraordinary educational expenses, (4) consider the children's health insurance costs and recurring uninsured medical expenses, and (5) consider the cost of Husband's work-related childcare. Husband further contends that it was improper for the trial court to utilize two different income figures when calculating his child support and alimony obligations. Wife counters that the trial court correctly determined the amount of child support Husband was obligated to pay when it calculated Husband's support obligation incorporating the income figure from the 1099 Form.

The Tennessee Child Support Guidelines ("the Guidelines") provide the following definition of gross income for child support purposes:

Gross income of each parent shall be determined in the process of setting the presumptive child support order and shall include all income from any source (before deductions for taxes and other deductions such as credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following:

(i)     Wages;

(ii)    Salaries;

(iii)   Commissions, fees, and tips;

(iv)    Income from self-employment;

(v)     Bonuses;

(vi)    Overtime payments;

(vii)    Severance pay;

(viii)    Pensions or retirement plans including, but not limited to, Social Security, Veterans Affairs Department, Railroad Retirement Board, Keoughs, and Individual Retirement Accounts (IRAs);

(ix)    Interest income;

(x)    Dividend income;

(xi)    Trust income;

(xii)    Annuities;

(xiii)    Net capital gains;

(xiv)    Disability or retirement benefits that are received from the Social Security Administration pursuant to Title II of the Social Security Act or from the Veterans Affairs Department, whether paid to the parent or to the child based upon the parent's account;

(xv)    Workers compensation benefits, whether temporary or permanent;

(xvi)    Unemployment insurance benefits;

(xvii)    Judgments recovered for personal injuries and awards from other civil actions;

(xviii)    Gifts that consist of cash or other liquid instruments, or which can be converted to cash, or which can produce income such as real estate, or which reduces a parent's living expenses such as housing paid by others; in whole or in part;

(xix)    Inheritances that consist of cash or other liquid instruments, or which can be converted to cash, or which can produce income such as real estate;

(xx)    Prizes;

(xxi)    Lottery winnings;

(xxii)  Alimony or maintenance received from persons other than parties to the proceeding before the tribunal; and

(xxiii)  Actual income earned during incarceration by an inmate.

Tenn. Comp. R. & Regs. § 1240-02-04-.04(3)(a)(1).

As our Supreme Court has explained:

These guidelines, when applied to an obligor whose income is derived from a salary and an occasional bonus or dividend, yield an easily quantitated child support amount.  Once the obligor's income has been determined and the Child Support Guidelines have been applied, the calculation of child support is made with certainty, predictability, and precision.

Although achieving such precision is possible when calculating the child support owed by a salaried obligor, the calculation is much more difficult and much less precise when the obligor is self-employed. *See Koch v. Koch*, 874 S.W.2d 571, 576 (Tenn. Ct. App. 1993).  The Child Support Guidelines therefore provide a different method for calculating a self-employed obligor's income.  In the self-employed obligor's situation, the guidelines require the trial court to consider all income of the obligor parent, reduced only by reasonable expenses to produce the income.  Income from self-employment "includes income from business operations and rental properties, etc., less reasonable expenses necessary to produce such income." Tenn. Comp. R. & Regs. § 1240-2-4-.03(3)(a)(2) (1994).

These self-employment guidelines are fashioned in such a way as to authorize the trial court to address the potential of a self-employed obligor to manipulate income for the purpose of avoiding payment of child support. Courts have recognized that a self-employed obligor has the opportunity to "'manipulate his reported income by either failing to aggressively solicit business or by inflating his expenses, thereby minimizing his income.'" *Mitts v. Mitts*, 39 S.W.3d 142, 148 (Tenn. Ct. App. 2000) (quoting *Sandusky v. Sandusky*, No. 01A01-9808-CH-00416, 1999 WL 734531, at *4 (Tenn. Ct. App. Sept. 22, 1999)).

*Taylor v. Fezell*, 158 S.W.3d 352, 357-358 (Tenn. 2005).

## A. Self-Employment Tax

Husband asserts that the trial court erred by failing to consider the amount of self-employment tax he had paid in its finding regarding his income and its resulting calculation of child support. The Guidelines provide the following direction concerning self-employment tax:

> Any self-employment tax paid up to one-half of the maximum amounts due in a year shall be deducted from gross income as part of the calculation of a parent's Adjusted Gross Income, as indicated in Part II of the CS Worksheet.

Tenn. Comp. R. & Regs.§ 1240-02-04-.04(4)(e) (emphasis added). Tennessee's child support worksheet form, in Part II, includes a specific line item for "self-employment tax paid" when computing a party's adjusted gross income.

The Guidelines clearly provide that self-employment tax paid by a parent "shall be deducted from that parent's gross income." *Id.* Here, the trial court utilized the 1099 Form as the measure of Husband's income for child support purposes. The 1099 Form, however, did not include information concerning the amounts Husband paid in self-employment tax. Instead, the 1099 Form merely listed Husband's annual compensation amount, which the trial court divided by twelve to calculate his monthly gross income. On the child support worksheet utilized by the trial court, the court made no entries on Part II for self-employment tax paid with the result that Husband's gross income figure and his adjusted gross income amount were the same.

Several different means of determining Husband's income were admitted into evidence, including Husband's federal income tax returns for the years 2019 through 2021, which did capture the amounts he had paid for self-employment tax.[1] Moreover, Husband was specifically questioned regarding self-employment tax, and he testified as to the amount of self-employment tax that he had paid as shown on those tax returns. Although the trial court deemed Husband's 2021 income tax returns to be an appropriate measure of Husband's income when calculating Husband's alimony obligation, the court chose to use the income amount from the 1099 Form from 2022 when calculating child support. We agree with Husband that it is the typical practice of trial courts to utilize the same income figures for a party when making both alimony and child support determinations. We also recognize that it is within the trial court's discretion to utilize a range of acceptable sources for a party's income amount for purposes of calculating child support. *See Sellers v. Walker*, No. E2014-00717-COA-R3-CV, 2015 WL 1934489, at *6 (Tenn. Ct. App. Jan. 13, 2015) (affirming a lower court's decision to use an obligor's deposits and expenses as shown in his business account as his income figure when his tax returns were found to be unreliable); *Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723, at *11

---

[1] Husband testified that at the time of trial, his income tax return for 2022 had not yet been prepared.

(Tenn. Ct. App. Sept. 18, 2007) (determining a self-employed obligor's income to be $149,228 based on business account deposits and expenses despite his reporting zero net income through his tax return for the same year).

However, regardless of the source utilized, the Guidelines direct that self-employment taxes shall be deducted from the gross income of a self-employed parent. Husband demonstrated that he had paid self-employment tax as reflected on his income tax returns for 2019 through 2021. Accordingly, the trial court erred when it failed to deduct the amount of self-employment tax paid by Husband from his gross income on the child support worksheet in accordance with the Guidelines. We must therefore reverse and remand the child support determination to the trial court for recalculation. Upon remand, the trial court shall determine the proper amount of self-employment tax to be deducted from Husband's gross income on the child support worksheet when recalculating Husband's child support obligation.[2]

## B. Ordinary and Reasonable Business Expenses

Husband also argues that the trial court erred when it failed to deduct his ordinary and reasonable business expenses from his gross income amount when calculating his child support obligation. He claims that the court erred in using his income figure from the 1099 Form to calculate his child support obligation when that form did not contain information regarding the ordinary and reasonable business expenses paid by Husband.

The Guidelines provide that "[i]ncome from self-employment includes income from, but not limited to, business operations, work as an independent contractor or consultant, sales of goods or services, and rental properties, etc., less ordinary and reasonable expenses necessary to produce such income." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(3)(i) (emphasis added). The Guidelines also highlight expenses that are not considered ordinary and reasonable, such as "[e]xcessive promotional expenses, excessive travel expenses, excessive car expenses or excessive personal expenses, or depreciation on equipment, the cost of operation of home offices . . . [and] [a]mounts allowed by the Internal Revenue Service for accelerated depreciation or investment tax credits[.]" Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(3)(ii). Moreover, when a business deduction is challenged, the obligor "has the burden of showing that the challenged deduction was a reasonable expense necessary to produce his income." *Norton v. Norton*, No. W1999-02176-COA-R3-CV, 2000 WL 52819, at *5 (Tenn. Ct. App. Jan. 10, 2000).

---

[2] We acknowledge that Husband was not questioned regarding the amount of self-employment tax that he paid in 2022. Husband had instead sought to rely on his 2021 tax returns, purportedly because his income was higher in 2021 than it was in 2022. When determining Husband's income for child support purposes, the trial court chose to use the income figure on the 1099 Form from 2022 because it was his "latest proof of income." In doing so, however, the trial court was still required to consider the monthly amount of self-employment tax paid by Husband when completing the child support worksheet. Accordingly, upon remand, the trial court may find it necessary to receive additional evidence concerning this amount.

Here, the trial court's final decree is silent concerning any ordinary and reasonable business expenses incurred by Husband. The trial court chose to calculate child support based on a gross income figure shown on the 1099 Form but did not consider whether Husband had paid business expenses from that amount, despite Husband's lengthy testimony concerning the payment of such expenses in previous years. Furthermore, we note that Wife did not question or challenge any of Husband's claimed business expenses for the years 2019 through 2021. Accordingly, on remand, the trial court shall also determine the amount of ordinary and reasonable business expenses incurred by Husband and deduct such expenses from his income when recalculating his child support obligation consistent with the Guidelines. If necessary, the trial court may hear additional evidence concerning this issue.

## C. Extraordinary Educational Expenses

Pursuant to the parties' agreed PPP, "Husband shall continue to pay for the children's tuition, costs, and fees associated with their school(s)." The evidence demonstrated that Husband paid $1,923.00 in monthly tuition for the children's private school education. Husband argues that because extraordinary educational expenses may be considered a deviation to a party's child support obligation pursuant to the Guidelines, the trial court erred in failing to consider a deviation in Husband's child support obligation predicated on his payment of monthly tuition expenses for the children. Wife contends that the trial court maintains discretion concerning whether to consider extraordinary educational expenses as a deviation on the child support worksheet and that the trial court did not abuse its discretion by failing to include such a deviation here when considering the totality of the evidence.

The Guidelines provide that the "amounts of support established by these Guidelines are rebuttable" and that the court "may order as a deviation an amount of support different from the amount of the presumptive child support order if the deviation complies with the requirements of" the Guidelines. See Tenn. Comp. R. & Regs. § 1240-02-04-.07(1)(a), (b). The Guidelines provide that such deviations are within the discretion of the trial court and that the "court must state the basis for the deviation . . . [and,] [i]n deviating from the Guidelines, primary consideration must be given to the best interest of the child for whom support under these Guidelines is being determined." Tenn. Comp. R. & Regs. § 1240-02-04-.07(1)(b).

As the Guidelines further provide:

When ordering a deviation from the presumptive amount of child support established by the Guidelines, the tribunal's order shall contain written findings of fact stating:

- 14 -

1. The reasons for the change or deviation from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and

2. The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and

3. How, in its determination,

   (i) Application of the Guidelines would be unjust or inappropriate in the particular case before the tribunal; and

   (ii) The best interests of the child for whom support is being determined will be served by deviation from the presumptive guideline amount.

Tenn. Comp. R. & Regs. § 1240-02-04-.07(1)(c).

Concerning deviations for extraordinary education expenses, the Guidelines provide:

> Extraordinary educational expenses may be added to the presumptive child support as a deviation. Extraordinary educational expenses include, but are not limited to, tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with special needs education or private elementary and/or secondary schooling that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together.

Tenn. Comp. R. & Regs. § 1240-02-04-.07(2)(d)(1)(i).

In support of his argument that the trial court should have considered a deviation for extraordinary educational expenses in this case, Husband relies on this Court's opinion in *Buntin v. Buntin*, 673 S.W.3d 593, 605 (Tenn. Ct. App. 2023), wherein this Court affirmed a lower court's reduction of the father's child support obligation to zero when the father had agreed to pay the children's private school tuition in an amount that was greater than his presumptive child support obligation. The trial court in *Buntin* had reasoned that (1) the Buntin children had been attending the same private school since they began middle school, (2) the father had agreed to pay all expenses associated with the children's private school, (3) the private school tuition before expenses and books would exceed the monthly presumptive child support amount, and (4) the children's continued enrollment in private

- 15 -

school was "in their best interests and consistent with the means of the family." *Id.* at 604. On appeal, this Court affirmed, reiterating:

> [W]ith regard to a child support determination, we "do not have the latitude to substitute [our] discretion for that of the trial court" and that the lower court's "discretionary decision will be upheld as long as it is not clearly unreasonable, and reasonable minds can disagree about its correctness." *See Richardson* [v. *Spanos*], 189 S.W.3d 725 [(Tenn. Ct. App. 2005)].

*Buntin*, 673 S.W.3d at 605. We further noted that the trial court had properly followed the directive of the guidelines when it (1) found the amount of the presumptive child support award, (2) stated valid reasons for the deviation, and (3) determined that the deviation was in the children's best interest. *Id.*

The present matter is distinguishable from *Buntin* because the trial court here did not elect to consider a downward deviation in Husband's child support obligation for the children's educational expenses. We reiterate that the trial court was not required to do so. Consideration of extraordinary educational expenses is not mandatory when determining a party's child support obligation. *See* Tenn. Comp. R. & Regs. § 1240-02-04-.07(2)(d)(1)(i) ("Extraordinary educational expenses may be added to the presumptive child support as a deviation.") (emphasis added). Moreover, the Tennessee Supreme Court has declined to hold that expenses incurred to send a child to private school are always treated as extraordinary educational expenses because these expenses are added to the amount of child support required by the Guidelines' formula and "could very well impose a child support obligation on a non-custodial spouse far beyond that spouse's ability to pay." *See Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *8 (Tenn. Ct. App. Apr. 5, 2001) (citing *Barnett v. Barnett*, 27 S.W.3d 904, 908 (Tenn. 2000); *Dwight v. Dwight*, 936 S.W.2d 945, 950 (Tenn. Ct. App. 1996)). Also, when awarding a deviation, the court must show how "the best interests of the child for whom support is being determined will be served by deviation from the presumptive guideline amount." Tenn. Comp. R. & Regs. § 1240-02-04-.07(1)(c)(ii) (emphasis added).

We determine that the trial court did not apply an incorrect legal standard, reach an illogical decision, base its decision on an erroneous assessment of the evidence, or employ reasoning that caused an injustice to Husband by declining to consider extraordinary educational expenses when calculating Husband's child support obligation. *See Richardson*, 189 S.W.3d at 725. Accordingly, we do not require the trial court to consider such a deviation when it recalculates Husband's support obligation on remand.

### D. Health Insurance and Recurring Uninsured Medical Expenses

Pursuant to the parties' agreed PPP, Husband is required to provide health insurance for both children and to pay for any reasonable and necessary medical expenses not covered

by insurance. Husband asserts that he should receive credit for his payment of health insurance and recurring medical expenses for the children in the calculation of his child support obligation pursuant to the Guidelines.

Husband is correct that the Guidelines provide that the children's health insurance premium shall be included in the calculation to determine child support. *See* Tenn. Comp. R. & Regs. §§ 1240-02-04-.04(8)(a). When the amount of the health insurance premium that is attributable to the children cannot be ascertained, the total amount of the premium is to be divided by the number of persons covered by the policy and that per-person cost is to be multiplied by the number of children covered by the policy. *See* Tenn. Comp. R. & Regs. § 1240-02-04-.08(b). We determine that the trial court erred by failing to include the cost of the children's health insurance premiums when calculating Husband's child support obligation in accordance with the Guidelines. Therefore, upon remand, the trial court shall also consider the proper amount of the children's health insurance costs to be listed on the child support worksheet when the court recalculates Husband's child support obligation.

The Guidelines also allow for the deduction of the children's recurring, uninsured medical expenses. Specifically, the guidelines provide:

> If uninsured medical expenses are routinely incurred so that a specific monthly amount can be reasonably established, a specific dollar amount shall be added to the basic child support obligation to cover those established expenses. These expenses shall be pro-rated between the parents according to each parent's percentage of income.

Tenn. Comp. R. & Regs. § 1240-02-04-.04(8)(d)(2).

However, if uninsured medical expenses are not such that a regular monthly amount can reasonably be established, no amount shall be added to the basic child support obligation; instead, the unknown expenses shall be paid as incurred by the parents according to their pro-rata percentage of income unless otherwise ordered. *See* Tenn. Comp. R. & Regs. §§ 1240-02-04-.04(8)(d)(3). Here, Husband included in his income and expense statement a $600.00 expense for medical, dental, or prescription expenses for the children. Husband testified that the $600.00 monthly expense was for medications for J.H. that she takes regularly and that are expensive despite the existing health insurance coverage. Upon remand, the trial court shall consider and determine whether J.H.'s medication expense is routine and recurring and whether this expense should be included on the child support worksheet, pursuant to the Guidelines, while taking into account that Husband has agreed to be solely responsible for these expenses.

## E. Work-Related Childcare

Husband avers that his estimated monthly work-related childcare costs are "less than $1,000.00." He argues that the trial court erred by failing to include this expense as an adjustment to his base child support obligation. Husband is not seeking an adjustment for the cost of childcare incurred when Wife is exercising her co-parenting time, nor does he argue that the PPP requires him to incur such an expense. Husband appears to be seeking only a credit for his own work-related childcare expenses incurred during his co-parenting time.

The Guidelines provide that the cost of work-related childcare "shall be included in the calculations to determine child support" and "shall be divided between the parents pro rata based on the [income] of each parent." Tenn. Comp. R. & Regs. § 1240-02-04-.04(8)(a)(1), (3). The Guidelines define "work-related childcare expenses" as "expenses necessary for either parent's employment, education, or vocational training that are determined by the tribunal to be appropriate, and that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. § 1240-02-04-.04(8)(c)(1). The costs shall be "averaged for a monthly amount and entered on the Worksheet in the column of the parent initially paying the expense." Tenn. Comp. R. & Regs. § 1240-02-04-.04(8)(c)(1).

On remand, the trial court shall determine the amount of work-related childcare expenses incurred by the parties and modify the child support worksheet to include such expenses when recalculating the child support award.

## VI. Imputation of Income to Wife

Husband argues that the trial court erred by (1) failing to impute income to Wife for child support purposes and (2) stating that Husband never raised the issue of Wife's willful underemployment. Wife contends that the trial court did fairly account for her earning potential when the court reduced her alimony award after a year in an amount proportionate to what Wife could reasonably be expected to earn based on her time out of the workforce, her level of education, her previous work experience, and the luxurious standard of living enjoyed by both parties prior to the divorce.

The Guidelines provide that "imputing additional gross income to a parent is appropriate . . . [i]f a parent has been determined by a tribunal to be willfully underemployed or unemployed." Tenn. Comp. R. & Regs. § 1240-02-04-.04(3)(a)(2)(i). Courts may impute income not actually earned by a party when a parent is willfully underemployed "based on the premise that parents may not avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009).

Based on the testimony at trial, the trial court made findings of fact in its final order pertinent to Wife's employability. The court found that Wife was fifty-two years old and maintained a degree in philosophy and three paralegal certificates. Wife had been the primary caretaker for the parties' two minor children and had not worked outside the home during the five years preceding trial. Although Wife acknowledged that she had never had difficulty finding employment in the past and that she suffered no physical or mental limitations relative to her ability to work, the trial court also cited Wife's struggle with her mental health, specifically referencing a 2021 incident when Wife threatened self-harm and was admitted to a hospital for a period of time. Wife was found to have applied for more than ten jobs and to have secured at least one scheduled interview, where if she were chosen to fill that position, she would receive an annual salary of approximately $80,000.00.

When dividing the marital assets and liabilities, the trial court found that both parties were of similar age and that neither party appeared to present any physical or mental impairments that would affect their ability to work. The court determined that Wife intended to return to work and that the most Wife had previously made as a paralegal in the Chattanooga area was $50,000.00 in 2013. The court recognized that Husband had supported Wife's endeavor to pursue further higher education and that despite excelling in her courses, Wife had dropped out of her program after a semester.

When making its determination of child support, the trial court found that Husband "neither argued nor requested the Court impute any income to Wife on the basis that she is willfully unemployed." Husband argues that he did sufficiently request that the court impute income to Wife on the basis that she was willfully underemployed when Husband's counsel remarked in opening statements that Wife "has not been employed . . . since 2010, which is of her volition and choice. You'll hear proof with regard to that, her ability to have a job and seek a job if she would so choose." At trial, counsel for Husband proceeded with several lines of questioning related to Wife's unemployment and her job experience during her previous periods of employment. Both parties provided substantial testimony relative to the topic, which the trial court repeated in its factual findings and determinations as to the division of the martial assets and liabilities. During closing arguments, Husband's counsel articulated that Husband was "seeking that [Wife] return to the workforce."

We note that Tennessee courts have long adhered to the principle that a party's proof must correspond with the allegations set forth in the pleadings. *See Randolph v. Meduri*, 416 S.W.3d 378, 384 (Tenn. Ct. App. 2011). Tennessee Rule of Civil Procedure 15.02, however, creates an exception to the general rule that "[j]udgments awarded beyond the scope of the pleadings are void" by providing in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues

may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Accordingly, assuming, *arguendo*, that Husband failed to specifically request that the trial court impute income to Wife for child support purposes, we determine that the parties tried the issues of Wife's willful underemployment and imputation of income to her by implied consent. Husband elicited abundant testimony on the matter through his counsel's questioning of both parties, specifically asserted to the trial court that Wife was unemployed by her own choice, and sought to establish that Wife was able to return to the workforce. We therefore determine that the trial court erred by refusing to consider this issue. Upon remand, when recalculating child support, the trial court shall determine whether Wife was willfully underemployed and, if such underemployment is proven, impute income to Wife in an appropriate amount pursuant to the Guidelines.

## VII. Inclusion of Marital Liabilities

Husband contends that the trial court erred by failing to include certain marital liabilities for which he is responsible in its distribution of the marital estate. Specifically, Husband insists that the trial court erred in failing to equitably distribute two loans—a "BHG" loan and a "Lending Point" loan—when both loans were marital debts.

"Marital debts" have been defined as "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Our Supreme Court has set forth four factors to be used by trial courts when equitably distributing marital debts: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Id.* at 814.

Prior to trial, Husband filed an income and expense statement wherein he identified payments made to BHG on a loan, which cost him $1404.00 monthly to service, and to Lending Point on a loan, which cost him $340.00 monthly to service. During trial, Husband explained that the BHG and Lending Point loans were incurred because he "couldn't pay all the expenses [he] had once [Wife] left and went into the rental." We note, however, that when Husband filed his amended asset and liability statement prior to trial, he made no mention of these particular loans in the enumeration of the parties' significant debts. Moreover, Husband introduced this same statement as an exhibit during trial, again making no reference to the BHG or Lending Point loans as marital liabilities when doing so. In addition, when Husband introduced specific documentation at trial concerning other loans and their respective amounts owed, he produced no documentation concerning these loans.

In its final decree, the trial court did not allocate the BHG and Lending Point loans as part of the marital estate. The trial court did distribute all of the debts identified by

Husband in his assets and liabilities statement, allocating $601,171.50 in liabilities to Husband and $143,703.07 to Wife. However, the trial court explicitly stated in a footnote:

> [The amount of Husband's monthly debt payments found by the trial court] does not include the "BHG Loan" and "Lending Point Loan" referenced in Husband's [income and expense statement]. Such loans were not identified as liabilities in Husband's amended asset and liability statement. Further, unlike the [other] loans, the Court did not receive into evidence the instruments creating the alleged BHG and Lending Point liabilities.

Accordingly, it appears that the trial court properly discounted Husband's testimony concerning these liabilities because he (1) did not specifically include them on the asset and liability statement and (2) did not provide documentation demonstrating their existence and amounts. Inasmuch as "appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility, *see Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014), we decline to disturb the trial court's decision to omit these liabilities from its distribution of the parties' marital estate.

## VIII. Spousal Support Award

Finally, Husband contends that the trial court erred in awarding alimony *in futuro* to Wife. The trial court awarded to Wife alimony *in futuro* in the amount of $9,500.00 per month from October 1, 2023, to December 31, 2024. The court further ordered that beginning in January 2025, those payments would be reduced to $6,000.00 per month. Husband specifically argues that the court erred by (1) failing to apply the relevant factors for determining alimony; (2) failing to consider Husband's ability to pay; and (3) failing to consider Wife's potential income. Wife advances the position that the trial court did not abuse its discretion by awarding her alimony *in futuro* when the court specifically followed the statutory guidelines for determining alimony and reduced Wife's alimony *in futuro* award after January 1, 2025, in an amount appropriate considering Wife's earning potential.

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (West April 25, 2011, to current); *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012). Our statutory scheme indicates a legislative preference favoring short-term spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007).

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration

of the award." *Mayfield*, 395 S.W.3d at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008). However, "[c]hild support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay." *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998).

In the instant action, we have remanded the determination of Husband's child support obligation to the trial court to be recalculated pursuant to the Guidelines. Because the amount of Husband's child support obligation materially affects his ability to pay the amount of spousal support awarded, *see Anderton*, 988 S.W.2d at 679, we vacate the portion of the trial court's order awarding alimony to Wife and remand the issue of the appropriate amount of alimony to be awarded once Husband's child support obligation has been recalculated.

## IX. Conclusion

For the foregoing reasons, we vacate the trial court's awards of child support and alimony, and we remand these issues to the trial court for further determination and for any proceedings necessary and consistent with this Opinion. The trial court's order is affirmed in all other respects, including its distribution of the parties' marital assets and liabilities. Costs on appeal are taxed one-half to Husband, Daniel Seth Holliday, and one-half to Wife, Elizabeth Frances Holliday.

s/ Thomas R. Frierson, II

THOMAS R. FRIERSON, II, JUDGE